EL PASO ICE & REFRIGERATOR CO. v. CONSUMERS' ICE & COLD STORAGE CO.

(Court of Civil Appeals of Texas. El Paso. Nov. 16, 1911. On Rehearing, Dec. 20, 1911.)

1. JOINT ADVENTURES (§ 4*)—PROFITS AND LOSSES—DIVISION—PRESUMPTION.

Where plaintiff and defendant, independent ice manufacturers, jointly contracted to ice railroad cars for certain car lines, and the contracts were silent as to the relative duties of plaintiff and defendant, and also concerning the division of profits and losses, it would be presumed that the duties of the parties and the division of profits and losses were to be equal, though such presumption was not conclusive.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 4.*]

2. PARTNERSHIP (§ 20*) — EVIDENCE — CONTRACT—CONTEMPORANEOUS CONSTRUCTION.

Plaintiff and defendant had had separate contracts with certain refrigerator lines, by which they furnished one-half of the ice necessary for the refrigerator cars. Plaintiff, whose plant was adjacent to the track of the T. Railway, furnished the ice for the cars switched over that road, and defendant, whose plant was nearest the G. and R. I. roads, furnished the ice for cars being transported over them, and, in case of a shortage, each would purchase ice from the other, paying therefor at a specified rate. Thereafter plaintiff and defendant joined in single contracts with the car companies, by which they agreed jointly and severally to furnish the necessary ice for the cars. Thereafter plaintiff and defendant continued to ice the cars in the same manner as before, dividing the business as before, until there was a change of management in defendant company, when it was first claimed that plaintiff and defendant were partners under the contract. Held that, in accordance with the contemporaneous construction of the contract by the parties, there was no partnership relation, and that plaintiff and defendant were each entitled to the profits and subject to the losses occurring in a severance of the business in the same manner as previously conducted.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 20.*]

McKenzie, J., dissenting.

Appeal from District Court, El Paso County; A. M. Walthall, Judge.

Suit by the Consumers' Ice & Cold Storage Company against the El Paso Ice & Refrigerator Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Peyton F. Edwards and T. A. Falvey, for appellant. Davis & Goggin, for appellee.

HIGGINS, J. Consumers' Company, appellee, brought suit against the El Paso Company, appellant, to recover $2,415.80, with interest, alleged to be due upon open account for ice sold and delivered during months of June and July, 1908. In bar of the action, and by way of counterclaim and cross-action, the El Paso Company pleaded two certain contracts, dated March 5, 1904, one made by the parties hereto as first parties, with Armour Car Lines and Continental Fruit Express as second parties, the other with the parties hereto as first parties and Armour Packing Company as second party.

The contracts, omitting immaterial portions, are as follows:

First.

"This agreement, made and entered into this 5th day of March, A. D. 1904, by and between the El Paso Ice & Refrigerator Company, a corporation organized under the laws of the state of Texas, and the Consumers' Ice & Cold Storage Company, a corporation organized under the laws of the state of Texas, parties of the first part; and Armour Car Lines, a corporation organized under the laws of the state of New Jersey, and Continental Fruit Express, a corporation organized under the laws of the state of Illinois, parties of the second part, witnesseth: That the parties of the first part hereby jointly and severally sell and agree to deliver to the parties of the second part, and the parties of the second part hereby purchase and agree to accept from the parties of the first part, either jointly or severally, all such ice as parties of the second part may require during the life of this contract for the icing and reicing at El Paso,

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r indexes

Texas, of their refrigerator cars engaged in the transportation of perishable fruits and vegetables, upon the following conditions: (1) Parties of the second part shall notify parties of the first part as to the cars belonging to parties of the second part which require icing or reicing at El Paso, Texas; notice to either of said parties of the first part being acceptable to said parties of the first part as notice to both. (2) Parties of the first part, either jointly or severally, shall ice or reice such cars promptly. It is understood and agreed that any deviation from the established practice of icing cars moving via the Southern Pacific Atlantic System, and Rock Island System of railroad at the El Paso ice plant of the El Paso Ice & Refrigerator Company, and cars moving via the Texas & Pacific Railway at the El Paso ice plant of the Consumers' Ice & Cold Storage Company, may be made only when no additional loss of time will be suffered by the shipments in question as a result of such diversions; and with the further understanding and agreement that the parties of the first part, either jointly or severally, will assume and pay any switching expense caused thereby. Such diversions shall be arranged for in advance by parties of the first part in order to avoid possibility of confusion on the part of transportation companies handling the cars, or on the part of representative of parties of the second part. (4) It is mutually agreed that said ice is sold, to be delivered and accepted at the price of three dollars and fifty cents ($3.50) per ton of 2,000 pounds placed in bunkers of cars at El Paso, Texas. (5) Payment to be made by parties of the second part within thirty (30) days after the end of each month, as bills may be rendered for ice furnished by either of first parties. (6) This contract to govern on the settlement of bills for any ice furnished parties of the second part by parties of the first part from January 1st, 1904, until the date hereof, and shall remain in' effect and be binding upon the parties hereto, their heirs, administrators, successors and assigns, until its termination, December 31st, 1908. In witness whereof, the parties hereto have affixed their respective signatures the day and year first above written. El Paso Ice & Refrigerator Company, by A. Courchesne, Pres. Consumers' Ice & Cold Storage Co., by J. P. Dieter, Pres. Armour Car Lines, by F. W. Ellis, Genl. Manager. Continental Fruit Express, by F. W. Ellis, Vice President."

### Second.

"This agreement, made and entered into this fifth day of March, 1904, by and between the El Paso Ice & Refrigerator Company a corporation organized under the laws of the state of Texas, and the Consumers' Ice & Cold Storage Company, a corporation organized under the laws of the state of Texas, parties of the first part; and the Armour Packing Company, a corporation organized under the laws of the state of New Jersey, party of the second part, witnesseth: That parties of the first part hereby jointly and severally sell and agree to deliver to the party of the second part, and the party of the second part hereby purchases and agrees to receive from the parties of the first part, either jointly or severally, all such ice as party of the second part may require during the life of this contract, (a) for the refrigeration of the cold storage rooms in its branch house at El Paso, Texas; (b) for the icing and reicing of such of its refrigerator cars as may be required to be iced at El Paso, Texas; and (c) for packing and shipping purposes generally of party of the second part at said point, upon the following conditions: (1) Parties of the first part are to furnish the ice for the refrigeration of said sold storage rooms upon ten days' notice; for the icing and reicing of cars and for packing and shipping purposes generally promptly upon the request of the party of the second part; said cars to be iced and reiced with sufficient promptness so as not to delay their movement. (2) The ice to be supplied under this contract is to be delivered as follows: For use in furnishing refrigeration for the cold storage rooms at second party's branch house at El Paso, Texas, to be delivered at the door of said house; for use in icing and reicing cars, to be delivered properly stored away in the bunkers of said cars; and for packing and shipping purposes generally, to be delivered at the door of the Consumers' Ice & Cold Storage Company plant at El Paso, Texas. (4) It is mutually agreed that said ice is sold to be delivered and accepted at the price of three ($3.00) dollars per ton of two thousand (2,000) pounds each, except the ice furnished for icing and reicing of cars, for which the sum of three and one-half ($3.50) dollars per ton of two thousand (2,000) pounds each is to be paid. (5) Payment to be made by party of the second part within thirty days after the end of each month, as bills may be rendered, for ice furnished by either of the first parties. (7) This agreement is to continue in force for the period of five years from December thirty-first, 1903, unless sooner terminated by mutual agreement. In witness whereof, the parties hereto have affixed their respective signatures the day and year first above written. El Paso Ice & Refrigerator Company, by A. Courchesne, Prest. The Consumers' Ice & Cold Storage Co., by J. P. Dieter. Armour Packing Company, by Charles H. Pitkins, Secy."

The El Paso Company alleged it had furnished under the first contract far more than one-half of the ice required to fulfill the same, and, its own plant being insufficient to supply the necessary ice, it had been obliged to purchase same from the Consumers' Company and others in the open market at

a great loss, the net loss arising from purchasing ice and icing of cars under first described contract amounting to $22,609.92; that plaintiff and defendant were jointly and severally liable for the performance of said contracts, and it had been obliged to incur this loss in order to protect itself and the Consumers' Company from heavy damages which would have been incurred had said contract not been performed; that plaintiff and defendant were partners in said contracts, equally interested in the profits and losses arising therefrom, and each bound to furnish one-half of the ice required in performing the same. Said El Paso Company further alleged a profit made by the Consumers' Company on ice furnished under second contract, for one-half of which, amounting to $440.79, it was liable to the El Paso Company. Certain other amounts in controversy were alleged, a particular statement of which it is unnecessary to make in considering this appeal, and the El Paso Company concluded its answer with prayer for an accounting, alleging a balance due it on account of said loss of $10,569.02, for which it prayed judgment over against the Consumers' Company.

Upon trial before court judgment was rendered for Consumers' Company for $2,310.15 upon the account sued upon, and prayer of El Paso Company for accounting and judgment over for losses incurred by it was denied.

Conclusions of fact and law by trial court are as follows:

"Findings of Fact.

"First. That plaintiff sold and delivered to defendant during the months of June and July, 1908, 1,183,460 pounds of ice of the reasonable market value, in El Paso, Tex., of $3.50 per ton, and for which defendant promised to pay plaintiff at the rate $3.50 per ton, and plaintiff sold and delivered to defendant during said months 193,500 pounds of ice, for which defendant promised to pay plaintiff at the rate of $3 per ton.

"Second. That plaintiff promised and agreed to pay one-half of the switching charges on 113 cars diverted from defendant's to plaintiff's plant in the city of El Paso, Tex., which half of said switching charges amounts to the sum of $282.50.

"Third. That plaintiff and defendant are corporations incorporated under the laws of the state of Texas.

"Fourth. That plaintiff and defendant entered into the two contracts of date March 5, 1904, attached to defendant's pleadings.

"Fifth. That, prior to entering into said two contracts, plaintiff and defendant for several years had followed a practice under which plaintiff iced all cars going out over the Texas & Pacific Railway, the tracks of said railway being near plaintiff's ice plant in the city of El Paso, Tex., and defendant iced all cars going out over the Southern Pacific Railway, the tracks of which were near defendant's plant in said city, and that in icing said cars plaintiff and defendant performed the business separately, and each for itself accepted the profits and losses of its performance of the business.

"Sixth. I find that the same arrangement was carried into the contracts of March 5, 1904, and that it was contemplated by plaintiff and defendant that, as had been the previous practice, plaintiff should ice cars under said contracts going out over the Texas & Pacific Railway and have the profits and losses of that undertaking, and that defendant should ice cars going out over the Rock Island and Southern Pacific Railways, and have the profits and losses arising out of that undertaking.

"Seventh. That with the exception of the one-half of the switching charges on 113 cars switched over to the Texas & Pacific tracks, to be iced by the plaintiff, amounting to $282.50 as hereinabove found, there was no agreement or understanding between plaintiff and defendant whereby plaintiff in any way bound itself to pay the other switching charges and trucking charges claimed by defendant in its pleading.

"Eighth. That there was no agreement or understanding between plaintiff and defendant whereby they were to equally share the profits and losses arising out of a joint performance of the contracts of March 5, 1904.

"Ninth. That there was no agreement of partnership or in the nature of partnership or joint undertaking between plaintiff and defendant, either express or implied, whereby one became bound by the acts of the other in the nature of copartners in the performance of the contracts of March 5, 1904.

"Tenth. That at the time of entering into the contracts of March 5, 1904, plaintiff was indebted to defendant in the sum of $852 due for ice theretofore furnished by defendant to plaintiff. That thereafter plaintiff furnished to defendant ice from time to time to be used by defendant in icing cars under said contracts of March 5, 1904, which defendant purchased from plaintiff at the rate of $3.50 per ton. Thereafter defendant permitted plaintiff to offset the value of the ice purchased by defendant from plaintiff for use under said contracts of March 5, 1904, against said $852. That plaintiff and defendant had settlements of their accounts for ice purchased and sold. That on the 24th day of July, 1905, their running accounts were adjusted by defendant paying to plaintiff the sum of $435.75, and that on the 16th day of August, 1905, their running accounts were adjusted by defendant paying to plaintiff the sum of $257.25, and that on the 19th day of September, 1905, their running accounts were adjusted by defendant paying to plaintiff the sum of $48.83, and that on the 23d day of May, 1906, their running accounts were adjusted by defendant paying to plaintiff the sum of $81.90, and that on the

7th day of August, 1906, their running accounts were adjusted by defendant paying to plaintiff the sum of $1,202.78, and that on the 16th day of August, 1906, their running accounts were adjusted by defendant paying to plaintiff the sum of $506.45, and on the 15th day of August, 1908, all the pre-existing accounts were settled between plaintiff and defendant, except that covering ice furnished by plaintiff to defendant during the months of June and July of the year 1908, defendant then and there paying to plaintiff the sum of $512.11 in full satisfaction of all prior existing accounts and claims, except the account for ice sold to defendant by plaintiff during the months of July and August, 1908.

"Eleventh. That on or about the 13th day of June, 1908, plaintiff and defendant entered into an agreement that plaintiff would sell defendant ice for the purpose of carrying out said contracts of March 5, 1904, at the rate of $3 per ton, delivered on the platform at plaintiff's plant in the city of El Paso, Tex. That it was not agreed between the parties as to how long and as to how much ice plaintiff should furnish defendant at said rate, and that after plaintiff had furnished to defendant 193,500 pounds of ice at said rate, covering ice furnished the 13th, 14th, 15th, and 16th days of June, plaintiff refused to furnish defendant any more ice at said rate under said agreement for ice at $3 per ton. That at all times when defendant desired to purchase ice to comply with the contracts of March 5, 1904, it applied first to the plaintiff before purchasing elsewhere.

"Conclusions of Law.

"First. Plaintiff and defendant, being Texas corporations, could not under the law form such a copartnership as is alleged and relied upon by defendant.

"Second. That they could not lawfully agree to share the profits and losses of a joint undertaking so that one of the parties might be bound to the other for contribution on account of the losses incurred by such other in its performance of the joint contract; for the reason that such a copartnership or joint obligation would subject the assets of the corporation to loss through an agency beyond the power and control of its boards of directors, and would, therefore, be contrary to public policy, and invalid.

"Third. In view of the testimony and the consideration that an agreement to share the profits and losses of a joint performance of the contracts of March 5, 1904, would be invalid, I construe said contracts as providing for and hold that the parties contemplated that plaintiff and defendant should sever in the performance of said contracts, and I conclude that it was contemplated that each should receive the profits and sustain the losses incident to the separate perform-

ance by it of its share of the business under said contracts, and that it should not be bound to the other for the losses arising out of the performance by the other of its share of the contracts. In other words, that the plaintiff should ice cars going out on the Texas & Pacific Railway under said contracts and enjoy the profits and sustain the losses, if any, arising out of such performance, and that defendant should ice cars going out on the Southern Pacific and Rock Island Railways, and enjoy the profits and sustain the losses, if any, growing out of such performance of the contracts, and that neither should be liable to the other for the losses arising out of such other performance of the contracts or the expenses incurred by such other party in the performance of its part of the contract.

"Fourth. Under the agreement whereby plaintiff promised to sell to defendant ice for the purpose of carrying out said contracts of March 5, 1904, at the rate of $3 per ton, nothing having been said as to how much ice should be furnished at said rate and for how long ice at said rate would be furnished, the plaintiff, under the law, had the right to end such agreement at will, and did end said agreement on the ——— day of June, 1908, when it refused to furnish any more ice to defendant at said rate, and thereafter insisted upon receiving the sum of $3.50 per ton.

"Fifth. That defendant is entitled to recover on its cross-action and have credited against plaintiff's claim as an offset the sum of $282.50, one-half of the switching charges on the aforesaid 113 cars.

"Sixth. That plaintiff is entitled to recover of defendant balance after deducting said $282.50 the sum of $2,034.65, with interest thereon from the 1st day of January, 1909, at the rate of 6 per cent. per annum to this date, amounting to the total sum of $2,310.-15, and that it is entitled to legal interest thereon from date of judgment until paid."

It is urged that the contracts of March 5, 1904, if they created a partnership between the parties, as alleged by the El Paso Company, were in that respect void, under the rule inhibiting corporations from entering into partnership agreements, and therefore no cause of action based thereon can be maintained. We deem it unnecessary to decide this question, but for the purposes of this appeal shall assume the contracts of partnership alleged by the El Paso Company to be valid. It then remains only to determine what the relative rights of the parties were thereunder.

It is contended by the El Paso Company that the contracts being silent as to the relative duties and obligations of the ice companies in furnishing ice, and also upon the question of how profits and losses should be divided, the law implies and presumes equality in all of those respects, and the presump-

tion thus raised is conclusive and cannot be rebutted or varied.

[1] As to profits and losses, it is fairly well settled that the law implies an equal division in the absence of an agreement to the contrary. Cyc. 23, pp. 459, 460; Lindley on Part. (2d Am. Ed.) *pp. 349, 350. We think the same rule should apply as to the relative duties and obligations of the parties where the partnership agreement in that respect is also silent. These presumptions and implications of the law, however, are not conclusive; and, where the contracts are silent, recourse may properly be had to extrinsic evidence for the purpose of determining the rights of the parties in this respect, and it is not necessary that there be an express agreement upon the subject, but the same may be inferred from the acts and conduct and course of dealing of the parties with reference to the subject-matter. In Pars. Partn. (3d Ed.) *p. 258, it is said: "Partners may agree to own the stock, as they may to share the profits, in any proportions that they please, and, if they make no agreement, there is a presumption of law in favor of an equality of interest in the case of the property as there is of the profits. The authorities cited in the note will show that this presumption, though very general, is not quite universal; and it may be rebutted, both in relation to the property and to the profits." And in same work (*page 259, in note "p") it is said: "The presumption of equality of interest may be rebutted, not only by proof of an express agreement between the parties to share unequally, but by evidence of any modes of dealing, or of any transactions from which such a contract can be implied" —citing English case of Stewart v. Forbes, 1 Mac. & G. 137. Again, on *page 260 it is said to be pretty well settled, both in England and this country, that prevailing rule of law is that partners are interested in stock and profits in equal proportions, in the absence of any evidence to the contrary. In Cyc. 30, p. 696, it is said: "All partners are entitled to share equally in the firm profits, unless this right is varied, as it frequently is, by the express or implied agreement of the partners." And on page 451: "The profits of a partnership are to be divided equally between the partners, however unequal may be their contributions of capital or of services, in the absence of an agreement express or implied to the contrary, or unless some fact or circumstance exists from which it may be inferred that the partners intended that the profits should be divided in unequal proportions." In Johnston v. Ballard, 83 Tex. 486, 18 S. W. 686, our Supreme Court cites Mr. Justice Story with approval, as follows: "In the absence, however, of all precise stipulations between the partners in respect to their respective shares in the profits and losses, and in the absence of all other controlling evidence and circumstances, the rule of the common law is that they are to share equally of both, for in such case equality would seem to be equity." In same case the court also says: "The rule, we think, should be extended further, and that where there is no evidence, either direct or circumstantial, as to their respective shares in the capital stock, the presumption is also that they hold an equal interest." In case at bar the service to be performed constitutes or corresponds to the capital stock of the adventure, and the quotation last cited is peculiarly applicable in support of appellee's contention that resort could be had to extraneous facts and circumstances to show what were the respective obligations of the parties as between themselves with regard to furnishing the ice. In support further of foregoing propositions, see, also, Bates on Part. §§ 181, 211.

[2] Passing now to a consideration of the contracts relied upon by appellant, it will be noted they do not in any respect undertake to define the respective rights and obligations of the ice companies as between themselves. They merely fix their obligations to and rights against the second parties. From the fact alone that their obligations to and rights against the second parties were equal, it would properly be inferred that their rights and obligations as between themselves were equal; but, when we resort to and consider the situation and condition of the parties at the time the contracts were entered into, and the testimony of the parties as to the interpretation apparently placed by them upon their respective obligations, and their conduct up until 1908, we think the trial court was amply warranted in concluding that, as to the first-mentioned contract, the parties contemplated and intended that the Consumers' Company severally should ice cars passing over the Texas & Pacific Railway, receiving the profits and bearing the losses thereto incident, and the El Paso Company should severally ice cars passing over the Galveston, Harrisburg & San Antonio and Rock Island Railway Companies, receiving the profits and bearing the losses thereto incident. Prior to March 5, 1904, the two companies had separate and several contracts with the fruit express companies, by the terms of which each agreed to furnish one-half of the ice necessary for icing refrigerator cars, but the practice above stated was observed apparently without regard to whether or no each furnished one-half of the necessary ice. The plant of the Consumers' Company was adjacent to the tracks of the Texas & Pacific Railway, and the plant of the El Paso Company was in the yards or adjacent to the Galveston, Harrisburg & San Antonio tracks, and the Rock Island road it seems used the yards of the Galveston, Harrisburg & San Antonio. With this prior practice existing with reference to the icing of refrigerator cars and their respective plants thus

situated, the parties then, on March 5, 1904, entered into the contracts in controversy. Were these the only facts and circumstances relied upon by appellee to overturn the legal presumption in regard to the status of the parties under the contracts, we do not think it would be sufficient, but we find from the testimony that the parties continued this practice without any question ever being raised as to its propriety and correctness until the summer of 1908, when the control and management of the El Paso Company passed into new hands, and at a time when they were overwhelmed with demands for icing of cars passing over the Galveston, Harrisburg & San Antonio and Rock Island. During all this time the parties had been buying ice from each other at $3.50 per ton, as it was necessary to enable them to, respectively, ice cars passing over the said roads adjacent to their respective plants. Numerous settlements and adjustments of accounts for such ice had been made between the parties, with no intimation or contention of liability or responsibility on part of Consumers' Company to ice the Galveston, Harrisburg & San Antonio and Rock Island cars, but, so far as their conduct was concerned, it seemed to be understood by all parties that, as between themselves, it was the duty of the Consumers' Company to ice the Texas & Pacific cars, and of the El Paso Company to ice the Galveston, Harrisburg & San Antonio and Rock Island cars, each being paid separately and directly for such service, and making no report or accounting thereof to each other.

The second paragraph of first-described contract would clearly indicate that all of the parties contemplated the continuance of the established practice with reference to who should ice the cars passing over the different roads. This paragraph reads as follows: "Parties of the first part, either jointly or severally, shall ice or reice such cars promptly. It is understood and agreed that any deviation from the established practice of icing cars moving via the Southern Pacific Atlantic System and Rock Island System of railroad at the El Paso ice plant of the El Paso Ice & Refrigerator Company, and cars moving via the Texas & Pacific Railway at the El Paso ice plant of the Consumers' Ice & Cold Storage Company, may be made only when no additional loss of time will be suffered by the shipments in question as a result of such diversions." If it was contemplated that the established practice with reference to division of the obligation to ice cars should continue, then it would be a fair inference to conclude, further, that the ice companies contemplated that they should continue to severally receive the profits or bear the losses, as had been the established practice in the past. E. W. Neff, general manager of the El Paso Company, who consummated and executed the contracts in its be-

half, testified that there was no agreement as to sharing profits or losses, and his information was that one was to ice the Texas & Pacific cars and the other the Galveston, Harrisburg & San Antonio and Rock Island. That he never heard of any partnership or partnership ice account. The testimony of Peterson, manager of the Consumers' Company, fully sustains that company's theory of the respective rights and obligations of the parties as between themselves.

Upon the whole, we find there was no express agreement between the parties as to the division of business and of profits and losses, but it was contemplated and impliedly understood at the time the contracts were made that the Consumers' Company should ice the Texas & Pacific cars, receiving the profit, if any, or bearing the loss incident thereto, and the El Paso Company should ice the Galveston, Harrisburg & San Antonio and Rock Island cars, receiving the profit, if any, or bearing the loss incident thereto; that such was the established course and conduct of the original parties who made the contracts, and no question as to its correctness was ever raised until the change in control and management of El Paso Ice Company in 1908, and, under this condition of the record, we hold that the Consumers' Company is not liable to the El Paso Company for the losses sustained in icing the cars passing over the Galveston, Harrisburg & San Antonio and Rock Island Railways. It appears that considerably more ice was furnished by the Consumers' Company than by the El Paso Company to the Armour Packing Company under second above-described contract, and, as above stated, the El Paso Company is claiming $440.79 as its share of the profit made by the Consumers' Company under this contract for extra ice furnished by it.

The conclusions of the trial court and the testimony also is very vague and incomplete as to the respective rights of the parties under this contract; but, in view of the fact that both contracts were made and entered into at the same time, we hold that the parties contemplated and understood that they should sever in their performance of this contract also, each of the parties receiving the profits accruing from their partial performance. This holding is supported further by the course and conduct of the parties, the El Paso Company raising no question in regard thereto until 1908, when this whole controversy originally arose. So far as the record discloses, no objection was raised to the Consumers' Company furnishing more than one-half of the ice until the rush of business in the summer of 1908 had begun to lessen. Indeed, from the record it is apparent that the El Paso Company during the busy season of 1908 did not have sufficient ice to supply the demands of its city trade and to ice the Galveston, Harrisburg & San Antonio

and Rock Island cars under the other contract.

The judgment is therefore in all things affirmed.

### On Rehearing.

PER CURIAM.    Rehearing denied.

McKENZIE, J. (dissenting). I do not agree with my associates in the affirmance of this case. The trial court, among other findings of fact, found as follows:

"Third. That plaintiff and defendant are corporations incorporated under the laws of the state of Texas.

"Fourth. That plaintiff and defendant entered into the two contracts of date March 5, 1904, attached to defendant's pleadings.

"Fifth. That prior to entering into said two contracts plaintiff and defendant for several years had followed a practice under which plaintiff iced all cars going out over the Texas & Pacific Railway, the tracks of said railway being near plaintiff's ice plant in the city of El Paso, Tex., and defendant iced all cars going out over the Southern Pacific Railway, the tracks of which were near defendant's plant in said city, and that in icing said cars plaintiff and defendant performed the business separately, and each for itself accepted the profits and losses of its performance of the business.

"Sixth. I find that the same arrangement was carried into the contracts of March 5, 1904, and that it was contemplated by plaintiff and defendant that, as had been the previous practice, plaintiff should ice cars under said contracts going out over the Texas & Pacific Railway, and have the profits and losses of that undertaking, and that defendant should ice cars going out over the Rock Island and Southern Pacific Railways, and have the profits and losses arising out of that undertaking.

"Seventh. That with the exception of the one-half of the switching charges on 113 cars switched over to the Texas & Pacific tracks, to be iced by the plaintiff, amounting to $282.50 as hereinabove found, there was no agreement or understanding between plaintiff and defendant whereby plaintiff in any way bound itself to pay the other switching charges and trucking charges claimed by defendant in its pleading.

"Eighth. That there was no agreement or understanding between plaintiff and defendant whereby they were to equally share the profits and losses arising out of a joint performance of the contracts of March 5, 1904.

"Ninth. That there was no agreement of partnership or in the nature of partnership or joint undertaking between plaintiff and defendant, either express or implied, whereby one became bound by the acts of the other in the nature of copartners in the performance of the contracts of March 5, 1904."

And also found, among other conclusions of law, the following:

"First. Plaintiff and defendant, being Texas corporations, could not under the law form such a copartnership as is alleged and relied upon by defendant.

"Second. That they could not lawfully agree to share the profits and losses of a joint undertaking so that one of the parties might be bound to the other for contribution on account of the losses incurred by such other in its performance of the joint contract; for the reason that such a copartnership or joint obligation would subject the assets of the corporation to loss through an agency beyond the power and control of its Boards of Directors, and would, therefore, be contrary to public policy and invalid.

"Third. In view of the testimony and the consideration that an agreement to share the profits and losses of a joint performance of the contracts of March 5, 1904, would be invalid, I construe said contracts as providing for, and hold that the parties contemplated that plaintiff and defendant should sever in the performance of said contracts, and I conclude that it was contemplated that each should receive the profits and sustain the losses incident to the separate performance by it of its share of the business under said contracts, and that it should not be bound to the other for the losses arising out of the performance by the other of its share of the contracts. In other words, that the plaintiff should ice cars going out on the Texas & Pacific Railway under said contracts and enjoy the profits and sustain the losses, if any, arising out of such performance, and that defendant should ice cars going out on the Southern Pacific and Rock Island Railways and enjoy the profits and sustain the losses, if any, growing out of such performance of the contracts, and that neither should be liable to the other for the losses arising out of such other performance of the contracts or the expenses incurred by such other party in the performance of its part of the contract."

It appears from the foregoing findings of fact and conclusions of law that the trial court expressly held the contracts of March 5, 1904, void and against public policy, and accordingly excluded them from consideration in arriving at the verdict. I think this action of the trial court reversible error.

Article 651, subd. 7, Rev. St. 1895, expressly provides that private corporations may enter into any obligation or contract essential to their authorized business. In this case, it is undisputed that the undertaking as an enterprise of itself was within the corporate power and purpose of each corporation. From a reading of the contracts, which are fully set out in the majority opinion, there is to my mind no element of partnership or of mutual agency which extends to the control or management of the affairs of either corporation. There is no agreement to become partners, no partnership name adopted,

no firm name could be signed, no authority given whereby the one could use or sign the name of the other, no mutual agency, no control or management of the corporation is provided for. The only element of partnership which could be claimed is that of the sharing of profits and losses. This has been held to be insufficient to make the contracts void. It is not the element of partnership in carrying out a joint undertaking, which undertaking being within the corporate power and purpose of corporations, that the law protests against, but the loss of control of its own affairs by the corporation. I think the contracts valid and binding upon the parties. Markowitz v. Greenwall Theatrical Circuit Co., 75 S. W. 74; Bates v. Coronado Beach Co., 109 Cal. 160, 41 Pac. 855. The trial court having excluded said contracts from its consideration in arriving at the verdict committed reversible error. I think the error is as fatal to the verdict as if the cause had been one tried by jury, and the court had instructed the jury that it should not consider the two contracts because they were void, and were not binding upon the parties. The fact that the trial court erroneously excluded from his consideration the contracts, such action is presumed to have been injurious to the defendant, and the burden is upon the appellee to demonstrate that appellant was not injured by the error. G., C. & S. F. Ry. Co. v. Greenlee, 62 Tex. 349; G., C. & S. F. Ry. Co. v. Johnson, 91 Tex. 569, 44 S. W. 1067; G., H. & S. A. Ry. Co. v. Parish, 93 S. W. 682; T. M. Ry. Co. v. Lewis, 99 S. W. 577; Ft. W. & D. C. Ry. Co. v. Lynch, 136 S. W. 580.

I also differ with the majority of this court as to the proper construction to be placed upon the second paragraph of the first contract. It is to be presumed that the contract being in writing, it embodied all the terms of the agreement. This being true, I construe the two contracts simply to mean that the cars were to be iced promptly, and that any deviation from the established practice in icing the cars was to be made only when no additional time would be suffered by the shipments in question or as a result of any diversion, and, if a diversion became necessary in order to ice the cars promptly, the expense for same was to be borne by the ice companies jointly and severally, and, further, that, if diversion became necessary in order to ice the cars, certain notice should be given and arrangements made in advance for the express purpose of avoiding confusion or delay on the part of the transportation companies handling the cars or on the part of the agents of the owners of the refrigerator cars who were parties of the second part in said contracts. What intimation is there that this paragraph holds that the established practice meant the sharing of the profits and losses, or as to how the labor and expense in complying with the conditions of the contracts were in any manner to be divided as between the parties of the first part? If there is any relation as between the term "established practice" with the division of the profits and losses or sharing of the labor and expense in the performance of the contract as between the two ice companies, I fail to detect it. It seems to me to be plain and clear that the established practice which is mentioned in the two contracts meant the manner of icing the cars. It meant that the cars should be iced promptly and on the lines of the railroad that the cars were to be sent over; and, if for any reason it became necessary to divert the car or cars, the expense of such diversion should be borne by the ice companies jointly and severally and that the diversion should be made without delay or confusion. It further appears that the Armour Car Lines and the Continental Fruit Express, as parties of the second part, were not in any manner concerned as to the division of the profits and losses as between the contracting ice companies, nor were they concerned as to which one performed the labor and furnished the ice for the icing of the cars. They were concerned, however, as to the manner of the icing of the cars, and that said cars should be iced promptly and without delay or confusion to them. I think, therefore, that a holding that the term "established practice" included as between the parties a division of the profits and losses according to any previous practice or custom is error. I do not agree with the majority of the court that it is necessary to delve in presumptions in construing the two contracts as between the parties further than to presume that if the two contracts are silent on the subject as to the division of the profits and losses, and, if silent, the presumption would be that the profits and losses were to be equally divided as between them. This presumption, however, when indulged, only aids the appellant's contention that harm was done it by the trial court in excluding from consideration the two contracts. To this extent the appellant, by reason of the two contracts, upon the trial of the case, should have had the benefit of this presumption.

Neither do I agree with my associates that the two contracts are silent as to the relative duties and obligations of the parties in the performance of same. It appears that the contracts are written in plain language, there being no ambiguity, and each states that the parties shall jointly and severally perform and do the several things in the respective contracts mentioned, and that they were jointly and severally bound to perform the contracts according to their terms. Certainly plaintiff should not be permitted to say that it was bound, jointly and severally, to perform the duties and obligations as required of it by the contracts as to Armour Car Lines, Continental Fruit Express and the Armour Packing Company, and in the

next breath contend that, as between it and the appellant, it was not so bound, and if, perchance, it was so bound by said contracts, it was bound by a mere presumption of law which presumption could be overcome by oral testimony; nor should the appellee be permitted to say that it was bound in its liability to the Armour Car Lines and the other contracting parties, but as to appellant another rule should prevail, or that the contract had been abandoned and was not binding upon it. I think that, if the appellee was bound to the Armour Car Lines and the other contracting companies under said contracts, then, except under proper pleadings, substantiated by proper evidence, that it would be bound to the appellant by said contracts. If appellee desires to urge a defense as against the appellant that the written contracts did not embrace all the agreements as between them, or that there was an agreement contemporaneous with the one which was embraced in the two written contracts and that said agreement was not included in said written contracts, then it devolved upon the appellee to have properly pleaded the omitted part and to have alleged that said omission was made by fraud, accident, or mistake. Or, if the appellee sought to avoid the effect of the two written contracts by reason of a change made subsequently or by reason of an abandonment, I think that it was required of it to have made a proper pleading setting up such defenses. The contracts, being in writing, and, to my mind, in plain, unambiguous language, except as to the determination of the term "established practice," cannot be varied or avoided by the mere introduction of oral testimony except under a proper pleading. Self v. King, 28 Tex. 552; East Line & Red River Railroad Co. v. Garrett, 52 Tex. 133; Belcher v. Mulhall & Scaling, 57 Tex. 17; Loonie v. Tillman, 3 Tex. Civ. App. 332, 22 S. W. 524; Janes v. Ferd Heim Brewing Co., 44 S. W. 896; Earle v. Marx, 80 Tex. 39, 15 S. W. 595; Schwantkowsky v. Dykowsky, 132 S. W. 373.

As to the sufficiency of the evidence to sustain the judgment had there been proper pleadings to authorize the introduction of such evidence, I refrain from making any comments further than to say that I do not concur in all of the deductions as made by the majority opinion as to the effect of such evidence. For the reasons above assigned, it is, to my mind, clear that this cause should be reversed and remanded.

The defendant's defense was predicated upon the validity of the two written contracts. The court held said two contracts void and against public policy. Such action on the part of the court deprived the defendant of a legitimate defense, and the error is such that it should not be overlooked by this court. I think appellant's motion for rehearing should be granted.